Samuels, J.
William Foster, Martha Ann Johnson, Ellen Johnson, Richard Johnson, Betsey Johnson, Thomas Johnson, Eliza Johnson and Francis Johnson, persons of color, brought suit in forma pauperis in the Circuit court of Henrico, for the recovery of their freedom, against Kichard Adams, administrator of Francis Foster deceased, who had them in custody, holding them as slaves belonging to the estate of his intestate.
On the trial before the Circuit court evidence was offered tending to prove that on and before the 3d of November 1831, Francis Foster was the owner of a number of slaves, including William Foster, Betsey *486 Johnson, Francis Johnson and Thomas Johnson, four of the plaintiffs below: That Martha Ann Johnson, Ellen Johnson, Eliza Johnson and William Johnson, the other plaintiffs, are the children of Betsey Johnson, born since the date above named. That Francis Foster acknowledged that he was the father of said William and Betsey, and of others of his slaves not parties to this suit. That about the 3d of November 1831, Francis Foster, having previously determined to emancipate his natural children, their mother also his slave, and the issue of his children, took with him to the city of New York these objects of his favor, including William, Betsey, Francis and Thomas, the only parties to this suit then in existence. That whilst in New York, November 3d, 1831, he executed a paper in the form of a deed of emancipation, which was attested by one witness and acknowledged before the mayor of the city, and ordered to be recorded. By this deed he professed to emancipate, amongst others, William Foster, Betsey Johnson, Francis Johnson and Thomas Johnson. That the sojourn of Francis Foster and of the colored persons taken with him, at New York, was for a few days only. That Francis Foster, before going to New York, and whilst there, and after his return, spoke of the trip to that place as intended for the sole purpose of giving freedom to the objects of his favor. That he returned to Virginia bringing back with him the party he had carried to New York. That Foster’s reason for carrying his slaves to New York to be there emancipated, rather than to emancipate them in Virginia, was this, that they might remain in the state of Virginia; he supposing that the law requiring emancipated slaves to leave the state in twelve months would not extend to the case which he had devised. That after returning from New York, Foster and the party he had carried with him, lived together as a family upon terms of equality, and not *487 as a master with his slaves. That Foster on the 27th of July 1835, executed a will which was admitted to probat the 9th of May 1836. By this will he emancipated by name, in express terms, his slaves other than his own children, their mother, and their descendants: To some of these last mentioned he bequeathed a portion of his personal property. That the persons claiming freedom under the alleged manumission in New York had not at any time thereafter been treated or regarded as slaves, although not registered as free negroes; that they had always after the death of Foster up to the year 1850, acted as free people, and were not included in the inventory or appraisement of Foster’s estate: That in July 1850 they were taken into custody by the defendant below, claiming to hold them as slaves.
On the trial it was agreed that the laws of New York in force at the date of the deed of emancipation, should be considered as proved, as they are found in print, and used as if copied into the record. Looking to the statute of New York in force November 3d, 1831, thus made part of the evidence, it is seen that in § 1, p. 656, 1 Revised Statutes of New York, it is enacted, “ No person held as a slave shall be imported, introduced or brought into this state, on any pretence whatever, except in the cases hereinafter specified. Every such person shall be free. Every person held as a slave who hath been introduced or brought in this state contrary to the laws in force at the time shall be free.
' “ § 2. The preceding section, shall not be deemed to discharge from service any person held in slavery in any state of the United States under the laws thereof, who shall escape into this state.”
“ § 6. Any person, not being an inhabitant of this state, who shall be traveling to or from, or passing *488 through this state, may bring with him any person lawfully held by him in slavery, and may take such person with him from this state; but the person so held in slavery shall not reside or continue in this state more than nine months; and if such residence be continued beyond that time, such person shall be free.
“ § 7. Any person who or whose family shall reside part of the year in this state, and part of the year in any other state, may remove and bring with him or them, from time to time, any person lawfully held hy him in slavery, into this state, and may carry such person with him or them out of this state.”
After the evidence was thus heard in connection with the statute of New York, the defendant moved the court to exclude from the jury the deed and the deposition to prove its execution, and the parol testimony, because the deed was not executed or recorded according to the laws of Virginia, but in fraud of those laws, and in violation of the policy of this state as settled by the Court of appeals in the case of Lewis v. Fullerton, 1 Rand 15; and because parol evidence is not admissible or competent in Virginia to establish a claim to freedom by emancipation in 1831 or since that time. This motion the court overruled, and the defendant below excepted to the opinion of the court.
The defendant below also moved the court to instruct the jury that if they should believe from the evidence that the plaintiffs Betsey, William Foster, Francis and Thomas were the property of Francis Foster in the year 1831, and the others the descendants of Betsey, born in Virginia since that time; that he carried the four first named with him to the state of New York, with a view to evade the statutes of Virginia, concerning the emancipation of slaves, and the residence of free negroes in Virginia, and emanci *489 pated. them by the deed exhibited in this cause, with no intent on his part or on their part, that they should become citizens of New York, but with the intent to bring them back to Virginia to reside here; that whilst in New York he executed the deed given in evidence, and then brought the persons named in it back with him to Virginia; and that they have from that time to this, resided in Virginia without any other deed of emancipation to them, and without being registered according to law as free persons in Virginia, that then they were not entitled to freedom, and the jury must find for the defendant. Which instruction the court refused. The defendant then moved the court to instruct the jury that the children of Betsey Johnson, born since her return to Virginia, who are plaintiffs in the cause, are not entitled to their freedom. This instruction was also refused; and-another bill of exception was taken.
The jury having found a verdict for the plaintiff, the court rendered judgment thereon; and the question before the court is whether that judgment is erroneous.
If the deed of November 3d, 1831, had stood alone, or if it had had no other support than mere parol proof of Foster’s intention to manumit his slaves, the motion to exclude it from the jury should have been sustained. The court below, however, was bound, in acting on the motion, to look to the other evidence which tended to show Foster’s intention to emancipate his slaves according to the law of New York; that he went there and carried the slaves with him for that purpose; that according to the law of New York, thus voluntarily invoked by Foster, he was divestéd of all title to the slaves thus carried there. That the statute of New York, which is to be regarded as *490 proven, by its general provisions would embrace this case; that Foster’s title was not preserved by the terms of any exception therein. That all these exceptions apply to owners who, whilst in New York, continue to claim the slaves carried there. The deed, taken with the other evidence, might and ought to have been heard by the jury as tending to prove a manumission according to the laws of New York.
The plaintiffs’ counsel argued here that Foster’s purpose of keeping these parties in Virginia, notwithstanding the statute, 1 Rev. Code, p. 436, § 61, which required them to remove in twelve months after emancipation, was in contravention of public policy; that his scheme of carrying them to New York and emancipating them there, being intended to further his unlawful purpose, must be regarded as in fraud of the law, and therefore null and void in all its parts.
This argument does not apply to the first bill of exceptions, because the jury were to pass on the fraud alleged, and must necessarily have heard all the proof tending to show what was the nature of the transaction, before they could condemn it as fraudulent: The argument applies’ to the question on the second bill of exceptions only.
In reply it may be said that in a complex transaction like this, embracing various acts prompted by various motives, some of the acts may be valid and <others invalid. Thus the law permitted Foster to emancipate his slaves, even within the state, if he had ■chosen to do so; the mode in which he might have done so is prescribed by statute : Thus there was nothing unlawful in the emancipation of the slaves. There was nothing in the law to prevent Foster from taking his slaves whithersoever he chose for any reason that to him seemed good: To hold otherwise would be an .unjust interference with his rights of property. *491 If then the law allowed emancipation within the state, and moreover allowed Foster to cany the slaves out of the state, it is impossible to perceive a reason why an emancipation without the state, according to the law of the place where made, should not be fully recognized here.
Whenever the alternative is presented that a given transaction against law must either stand and the law be evaded, or the law be enforced and the transaction held for nought, without question the law must prevail. If there were nothing in the statute but § 61, 1 Rev. Code 436, the argument of plaintiffs’ counsel would deserve consideration; even then it is by no means clear that the section cited would not require the removal. Looking to § 64, 1 Rev. Code 437, we find a provision embracing the case before us. Foster’s scheme can hardly be said to have been an evasion of the law; seeing that if it escaped the operation of the 61st section, it would have been embraced by the more stringent provisions of the 64th section. There is no such conflict between the law and Foster’s transaction as makes it necessary, in vindication of the law, to hold that transaction void.
In regard to the first bill of exceptions, I place my opinion upon the ground, that if the jury should believe that Foster voluntarily went to New York, carrying his slaves with him for the purpose of setting them free; that he then and there invoked the aid of the laws to aid him in his purpose; and that in pursuance of those laws they were set free ,• this freedom should be recognized here; that consequently the evidence tending to prove the facts giving the freedom was properly permitted to go to the jury.
As to the second exception, I am of opinion the evidence did not tend to prove such fraud upon the law as would justify the jury in avoiding the transac *492 tion, and thereby find that the plaintiffs below were slaves; and that the instruction was properly refused.
No case can be found like this in its circumstances; yet general principles applicable thereto may be deduced from some of the cases. In Griffith v. Fanny, Gilm. 143, the owner having permitted his slave to reside in the state of Ohio, a nonslaveholding state, for no merely temporary purpose, it was held that the constitution of Ohio conferred the right of freedom. In Ben Mercer v. Gilman, 11 B. Monr. R. 210, the master having permitted his slave to go at large in the state of Illinois, (a nonslaveholding state,) and act as a free man, and having recognized his right to freedom, was held to have lost his title to his slave, and the slave to have become free. Where the master allowed his slave to reside in Maryland under circumstances to give the slave his freedom according to the law there, the master was held to have lost his right. Hunter v. Fulcher, 1 Leigh 172.
On the other hand, cases are found in which the owner is held not to have lost title to the slave; as. where the slave absconds from the master to a nonslaveholding state; the title in such case being protected by the federal constitution; or where the owner for a temporary purpose takes or sends his slave into a nonslaveholding state; or where under forms of law the courts of nonslaveholding states have adjudged in invitum that the master’s right was lost: In all such cases the owner’s right has been preserved. See Lewis v. Fullerton, 1 Rand. 15; Maria v. Kirby, 12 B. Monr. R. 542.
A safe, plain and practicable test of these questions will be found by ascertaining whether the owner intended to surrender his right of property under the operation of the laws of a nonslaveholding state; if he so intended, no wrong is done by giving effect to *493 Ms intention. If he did not so intend, his right of property should be held unimpaired, whatever may have been done to divest him thereof under color of law in*any nonslaveholding state.
I am of opinion to affirm the judgment.
Daniel, J. concurred in affirming the judgment.
The other judges concurred in the opinion of Samuels, J.
Judgment affirmed.